IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 29, 2005

**STATE OF TENNESSEE v. TONY ALLAN PHIPPS**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S45,670     Phyllis H. Miller, Judge**

---

**No. E2005-00647-CCA-R3-CD   Filed April 5, 2006**

---

On May 31, 2002, following a jury trial, Defendant, Tony Allan Phipps, was convicted of voluntary manslaughter. Defendant was sentenced to serve eleven (11) years in the Department of Correction and ordered to pay a fine in the amount of five thousand ($5000.00) dollars. Defendant filed a motion for new trial which the trial court granted on October 14, 2002. On August 11, 2004, following another jury trial, Defendant was convicted of reckless homicide, ordered to pay a five thousand ($5000.00) dollar fine and sentenced to ten (10) years in the Department of Correction. Defendant appeals his conviction for reckless homicide. In his appeal, Defendant argues (1) the evidence in the record is insufficient to sustain a conviction for reckless homicide; (2) the evidence in the record does not support the jury verdict; (3) the jury verdict is contrary to law and evidence; and (4) the State did not prove beyond a reasonable doubt that Defendant did not act in self-defense as required by Tennessee Code Annotated section 39-11-611(b) (2003). The judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOSEPH M. TIPTON, J., joined.

Larry R. Dillow, Kingsport, Tennessee, attorney for the appellant, Tony Allan Phipps.

Paul G. Summers, Attorney General and Reporter; Leslie Price, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; Barry P. Staubus, Assistant District Attorney General; Joseph Eugene Perrin, Assistant District Attorney General; and Brian Todd Martin, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

Linda Williams Miller testified that her son, the victim, Wallace Ray Williams, was thirty-five years old at the time of his death. Defendant and the victim were childhood friends. Defendant

and the victim later lived together in a house on Newborn Road in Kingsport, Tennessee. Ms. Miller went to visit her son at his house on Newborn, approximately two weeks prior to his death.

During this visit, Defendant asked to speak to Ms. Miller privately. Defendant told Ms. Miller that the victim claimed Defendant owed him money. Defendant claimed to have already paid his debt to the victim. The victim claimed that Defendant had not given him the entire amount. Defendant showed Ms. Miller a piece of paper the victim had given him. The paper had numbers on it, indicating Defendant still owed the victim two hundred dollars. Defendant denied owing the victim any money. Defendant never told Ms. Miller that the victim threatened him over the money or that they had any other problems related to the money. As the conversation ended, the victim returned home. Ms. Miller did not notice any significance about the disposition of either the victim or Defendant.

After his arrival, Ms. Miller visited with her son for approximately five minutes. He did not say anything about Defendant owing him money. As she was leaving, she spoke to Defendant again. He was preparing to take an insulin shot and told her that he was taking three or four shots a day. She instructed the victim, "Ray you'll have to help take care of Tony," and Defendant said, "Ray's okay," and then the victim said, "Tony and I are buddies aren't we Tony?" and Defendant responded, "Yeah." Ms. Miller did not detect any animosity or hatred between the men during this conversation. As far as Ms. Miller was aware, Defendant and the victim were on friendly terms right up until the time of the victim's death. She said she was aware that Defendant had a cell phone.

Amanda Kristen Bortz testified that she was twenty-four years old. She attended and graduated from Dobbyns-Bennett high school in 1998. At the time of trial, Ms. Bortz was incarcerated at the Johnson City jail for women prisoners. She was serving a two-year sentence after pleading guilty on January 10, 2003, to facilitating the commission of a burglary, theft over five hundred dollars, and two counts of forgery. In September 2001, Ms. Bortz was living at 1656 Newborn Road, Kingsport, Sullivan County, Tennessee. The home belonged to her boyfriend's mother, Sylvia Darnell Lyons, who lived in the home. Her boyfriend, Josh Darnell, also lived in the home, along with his brother, Jason Sean Christian. Both the victim and Defendant lived in the house as well. The victim was also dating one of Ms. Lyons's children, Sabrina Christian. At the time of the victim's death, Ms. Christian was incarcerated at the Johnson City jail.

The house had four bedrooms and one and a half bathrooms. The kitchen, bathrooms, living room, and laundry room were shared by the occupants. The living room is the first room entered from the front door. Beyond the living room, there is a hallway leading to bedrooms, the bathroom, and the kitchen. Defendant occupied the front right bedroom. The door to his room was constructed of metal and had slats that looked like vertical blinds but did not move. The door was flimsy and it was missing the handle. Defendant kept the door closed by using an old coat hanger and wire. The door did not stay closed without the coat hangar and wire. Ms. Bortz knew that it was easy to hear through the door because she had conducted conversations with Defendant while she was in the living room and he was inside his bedroom with the door closed.

At the time of the incident, Ms. Bortz had been living at the residence for about three or four months. She was aware of the fact that the victim had given Defendant some money. This fact was common knowledge within the house. Ms. Bortz never heard Defendant and the victim argue over the money. She was not aware of any problems between the men, nor was she aware of fights or heated arguments that had occurred prior to the incident.

On the evening of September 9, 2001, Ms. Bortz and the victim dropped off her boyfriend at the Johnson City jail to serve a weekend in jail. Ms. Bortz and the victim then went riding around, and when they returned to the house, they picked up Mr. Christian and went to a sports bar for some drinks. The sports bar was three or four hundred feet from the residence. Ms. Bortz had two beers. Mr. Christian and the victim ordered a pitcher. Mr. Christian had been drinking all day, but the victim had not and was not intoxicated at that time. Ms. Bortz decided to leave first, but she intended to return to the bar. She was spending the night with a friend and needed to go home first. She had no intentions of staying at the Newborn residence that night because her boyfriend was not there. Mr. Christian decided to go with her and the two of them left in the car. The victim walked back to the house shortly thereafter.

Ms. Bortz heard the victim return to the house around 2:00 a.m. She heard a knock on the door, and she heard Ms. Lyons respond that she didn't feel like company. She did not realize it was the victim knocking until he entered the house. Ms. Bortz said it was common for company to come and go at the house during such hours. Ms. Bortz had known the victim for years and did not think he appeared drunk when he entered the house. He went into the kitchen and began talking to Ms. Lyons. She was complaining about money and saying that everyone stayed there and took advantage of the house, but no one paid her any money. They argued for several minutes over money. Ms. Bortz observed the argument from the hallway looking into the kitchen. She said it was common for arguments over money to take place in the house. She said that Ms. Lyons always wanted money and that she had a serious drug problem. Ms. Lyons was always picking fights with people over money and she, in essence, had a similar fight with just about everyone in the house. During these fights, it was common for people to get very upset and curse each other.

As this particular fight progressed, the victim got very upset and loud and the argument escalated. During the argument, the victim said that Defendant owed him money and he would get Defendant to give him the money that he owed him. The victim then left the kitchen, charged past Ms. Bortz, and said "I'm going to get my money." The victim started yelling Defendant's name. He yelled out Defendant's name two or three times in a voice loud enough for Defendant to hear. Ms. Bortz did not hear Defendant respond to the victim, but she heard the noise from the television in Defendant's room. At this point, the victim was mad and irate and the argument had been going on for six or seven minutes. According to Ms. Bortz, Defendant would have been able to hear the victim yelling and hear everything that was said during the argument. The victim grabbed something and started shaking Defendant's bedroom door. The victim then yelled, "Bring your punk ass out here. We need to talk." The victim shook the door again, and the door opened towards him. As the victim started into the bedroom, Defendant shot him. According to Ms. Bortz, the victim never said "I'm going to come in and beat you," or "I'm going to come in and take my money," or anything else to that effect.

Ms. Bortz was standing in the doorway of the living room when the victim was shot. She could see most of the inside of Defendant's bedroom, and she could see Defendant. Defendant was standing next to his bed and aiming the gun toward the bedroom door. The victim did not have any weapons or other objects in his hands. Ms. Bortz said that after the shot was fired, the victim stumbled into Defendant's room "doubled over in pain." The victim turned toward the door to leave the room, and Defendant shot him again in his side. "Maybe a second" passed between each shot. The victim never struck, grabbed, or choked Defendant. Ms. Bortz was unaware that Defendant owned a gun, and she did not hear him announce that he had a gun that night.

After the victim was shot, Defendant came out of the bedroom and told Ms. Bortz to call 9-1-1. She went to find the cordless phone so that she could make the call. At this point, Mr. Christian came inside from behind the house because he heard the gunshots. He tried to help the victim until the emergency medical people arrived to take over. Ms. Bortz said that Defendant had a cell phone, and she knew it to be an operational cell phone which he kept with him.

On cross-examination, Ms. Bortz admitted that there was always a lot of arguing at the house, but Defendant was almost never involved in it. She said that Defendant primarily stayed in his room while he was home. If Defendant was sleeping, the door to his room was generally closed and secured with a coat hangar. He came out of his room occasionally, and she felt free to go into his room, but she never went into his room angry. She had also seen the victim in Defendant's room at times when they were not angry or fighting. She acknowledged that on the night of the incident, the victim was loud, he was furious, he had drank approximately a pitcher and a half of beer, and he was on "dope" when he charged toward Defendant's room to get his money. She said that when Defendant came out of the bedroom he said, "I did what I had to do." She said she was not scared of the victim's anger during the incident because she knew him well enough not to be frightened.

Officer Mark Mason, an investigator with the Kingsport Police Department, was called to the scene at the Newborn Road residence on September 10, 2001. Officer Mason arrived at the scene at approximately 2:45 a.m. When he arrived, there were already officers at the scene who were securing the premises by ensuring that the crime scene was not disturbed. Officer Mason took photographs and collected evidence at the scene. He identified these photographs at trial, and they were introduced into evidence. He also identified the revolver used by Defendant to shoot the victim, as well as the two bullets the hospital removed from the victim's body. He likewise described the layout of the home, and the manner in which Defendant's door opened and closed. He confirmed that the door opened into the hallway and that it was kept closed by wire and a coat hanger. The bedroom itself measured eleven feet by seven and a half feet. He could not testify as to whether the victim had been shot as he was moving forward into the room because the body was removed from the scene before he arrived.

Detective David Cole of the Kingsport Police Department, Criminal Investigations Division, arrived at approximately 3:00 a.m. The scene was secure when he arrived, and Detective Mason was already working to collect evidence and take photographs. Detective Cole familiarized himself with the scene and conducted interviews with the witnesses. He later reviewed and analyzed the evidence

collected by Detective Mason. He testified regarding several receipts that had been taken from a notebook belonging to Defendant. The first receipt was written on notebook paper. It was signed by the victim and referred to a debt between Defendant and the victim. The next receipt was from Toy Trains Antiques at 214 East Market Street in Kingsport. This undated receipt was for the purchase of a Traditions, 1851 Colt 44 "copy" revolver, serial number 456568. There was also a receipt from Eagle Arms and Ammunition, also located at 214 East Market Street in Kingsport. This receipt was dated August 16, 2001, and was for an "1851 44" steel frame revolver with the serial number 461568. The serial number of the revolver used in the homicide was not identified at trial. Finally, there was an entry in the notebook concerning money paid and owed to Ms. Lyons.

Detective Cole attended a course on basic blood stain analysis in Miami, Florida, in March 2001, and in May 2004, he attended an advanced forty-hour school for further training. The schools train on the identification of blood, blood staining, and blood spattering. Detective Cole analyzed the bed covering that was on Defendant's bed the night of the incident. The bed covering revealed stains from human blood on the end of the cover located closest to Defendant's bedroom door. The flooring surrounding Defendant's bed also contained stains consistent with human blood. Photographs introduced into evidence illustrated both the blood on the bed covering and on the floor.

On cross-examination, Detective Cole said that no photographs were taken of the victim at the crime scene. The victim was still alive when medical personnel arrived, and they had already removed the victim prior to the detective's arrival. Thus, he could not view the body to determine whether the victim had been charging into the room. He explained that life saving takes priority over everything else. He acknowledged that he arrived an hour after the shooting and did not know whether the bed covering had been moved since the shooting occurred. However, there was no indication that its position had been changed since the time of the shooting. There was a plastic chair placed on Defendant's bed, and Detective Cole initially testified that he did not know how it got there.

Detective Cole said that according to the witnesses, immediately preceding the shooting, Defendant did not come out of his bedroom, nor did they hear anything coming from inside his bedroom. He verified Ms. Bortz' statement that the victim charged past her and jerked open Defendant's bedroom door which was secured by a coat hanger. The victim weighed about one hundred and eighty pounds, and Defendant weight approximately one hundred pounds. Detective Cole agreed that the victim was blocking the only exit from the room. Detective Cole was aware that Defendant was a diabetic because the notebook taken from the scene contained a record of his blood sugar level. He also knew that Defendant wore glasses.

On re-direct examination, Detective Cole said that the emergency medical technicians were allowed to remove the body prior to the investigation in case there was a chance the victim could be revived or resuscitated. The victim actually died at the hospital some time later. He explained that the Kingsport Police Department does not bring bodies back to crime scenes for the purpose of taking photographs. Nor do they stage dummy bodies for that purpose. Detective Cole explained that "securing the scene" means that officers arrive and make sure that no one goes in and out of the

crime scene unless it is a member of the police department. All officers are trained in this procedure, and the purpose is to preserve evidence and maintain the condition of the crime scene. The scene remains secure until the officers have concluded their investigation. The officers follow certain protocol when a crime is committed and each investigating officer has a specific duty. One specific person is usually responsible for photographs and the collection of evidence, and in this case it was Detective Mason.

When Detective Cole arrived at the scene he found the scene to be secure. Defendant had been taken into custody, and Detective Cole was unaware of any time that Defendant was allowed back into the room for the purpose of making up his bed. Neither the detective, sergeant, nor emergency medical technicians had any responsibility for making up Defendant's bed. There were no stains on the top or side of the bedspread consistent with the victim having fallen on top of the bed. There was no blood spatter in the area where the firearm was found. No civilians or non-law enforcement officers were allowed to come into Defendant's bedroom during the officers' investigation. On re-cross examination, Detective Cole clarified his earlier testimony and stated that the emergency medical technicians had placed the plastic chair on the bed. He admitted that he did not ask any of the witnesses or technicians if they made up the bed.

Robert Royse testified that he has been employed at the Tennessee Bureau of Investigation Crime Laboratory in Nashville, Tennessee, since 1982. He is a special agent forensic scientist specializing in the area of firearms identification. He graduated from David Lipscomb College in Nashville, Tennessee, with a B.S. in biochemistry. He went through formal on the job training pursuant to the guidelines set forth by the Association of Firearm and Tool Mark Examiners. He has been qualified as an expert in the field of firearms identification in the State of Tennessee.

Firearms identification deals with the "examination of fired bullets, fired cartridge cases, fired shot shell cases and other ammunition components." The purpose of the examination is to determine which specific firearm fired the ammunition to the exclusion of all other firearms. Mr. Royse also performs muzzle to garment distance determinations, tool mark examinations, serial number restorations, and examines weapons and their safety features to determine if they are functional. If a weapon is not functional, he determines why not.

Mr. Royse examined a .44 caliber percussion revolver taken from Defendant's possession and submitted to him by the Kingsport Police Department. He also examined two spherical lead projectiles and a blue t-shirt taken from the victim. He explained that the revolver was an Italian reproduction of a Colt Model 1851 Percussion 44 caliber revolver. The weapon submitted by the police for examination had two empty chambers and four loaded chambers. It was a single action revolver commonly known as a "black powder weapon" or "handgun." Single action means that the hammer of the gun must be pulled back prior to each time the gun is fired. Because the gun is a "black powder" weapon, a lot of smoke is released each time the gun is fired.

"Percussion" revolvers differ from most modern firearms in that the ammunition is loaded into the front of the chambers of the cylinder and most modern firearms are loaded from the rear.

The weapon has six chambers in the cylinder in which to load ammunition. The bullets are loaded into the weapon by pouring black powder or pyrodex into the front chambers and then placing the bullets in the chamber. The bullet must be pushed down into the chamber using the loading lever because the diameter of the bullet exceeds that of the chamber. The bullet must also be lubricated to prevent chain fire. Chain fire occurs when the gun is fired a single time and more than one chamber discharges at the same time. Once the bullet is loaded, a percussion cap, the source of the ignition, is placed on the rear of each chamber of the cylinder to cause firing of the revolver.

Dr. Royse test fired the weapon and made a comparison to the two spherical projectiles taken from the victim's body. Dr. Royse determined that the bullets taken from the victim's body had the same class characteristics and similar individual characteristics as the test bullets fired from the revolver. Because of the nature of the projectile and the revolver, however, Dr. Royse could not conclusively determine that the bullets taken from the victim's body were fired from the revolver.

Dr. Royse also conducted a muzzle to garment distance determination on the blue t-shirt. The purpose of this test was to determine how far the weapon was from the victim wearing the garment at the time the weapon was fired. Because of the type of weapon used, the results of this test were inconclusive. There was nothing the police could have done in the handling of the t-shirt which could have resulted in conclusive results.

Dr. Gretel Harlan Stephens testified that she is a forensic pathologist employed by the State of Tennessee at East Tennessee State University's Quillen College of Medicine. She graduated from the University of Tennessee, Knoxville, Memphis State University and the University of Tennessee Medical School. She did an anatomic and clinical pathology residency at the University of Tennessee and City of Memphis Hospitals and is board certified in anatomic and clinical pathology. She worked primarily as a hospital pathologist for a number of years before practicing forensic pathology full-time. She was qualified by experience and passed her boards to become a forensic pathologist in 1994. While practicing in Johnson City, Dr. Stephens has conducted over one thousand and fifty autopsies. Prior to that she conducted over three thousand autopsies while serving as assistant to both the Shelby County and the Davidson County medical examiners. Dr. Stephens was qualified as an expert witness in forensic pathology.

Dr. Stephens conducted the autopsy on the victim on September 12, 2001. She determined that the victim had been shot two times, once in the chest and once in the abdomen. The victim died as a result of these gun shot wounds. The first wound examined, wound A, was found in the right side back of the chest, and followed a bullet path ending in the left side of the body. Dr. Stephens described the path of the bullet in detail, indicating all bones and internal organs struck by the bullet. In her opinion, the victim's chances of surviving wound A were less then fifty percent even had the victim been in the emergency room and subject to immediate emergency care.

Wound B indicated that the bullet entered the body in the middle of the upper torso, a little to the right of the midline of the body, and lodged against the back body. Again, Dr. Stephens described the path of the bullet and the resulting damage to the internal organs. She said that wound

B would also have been fatal "without immediate excellent medical care." Each of the wounds could have been fatal by itself. The victim did not die immediately from the wounds. He was resuscitated and kept alive on the way to the emergency room, but he was beyond resuscitation by the time he arrived there.

Dr. Stephens also did a test to determine the distance of the victim from the weapon at the time the wounds were sustained. She explained that when handguns or rifles are fired there are small particles of burning gunpowder and filler material from the charge which propel the bullet out of the gun. These particles will deposit in and on the skin's surface if the weapon is within two feet from the muzzle to the skin. The closer an individual is to the weapon, the more particles will be deposited on skin or clothing.

Dr. Stephens found a few widely scattered particles on the palm and back of the victim's right hand. She found no gunpowder residue on the victim's shirt or around his wounds. Based on this information, Dr. Stephens concluded that the distance between the end of the weapon and the victim's torso was "slightly beyond two feet or further." The residue on the victim's hand was spaciously deposited. There was no evidence indicating that the victim's hand was extended toward the weapon. Dr. Stephens opined that the victim's right hand was likely at the periphery of the black cloud emitted with the firing of the gun, indicating the victim was at least two feet from the gun. She also indicated the victim may have acquired the residue from an environmental surface.

Dr. Stephens stated that if the bullet was fired parallel to the ground, the bullet path indicated that the victim was leaning slightly toward the gun both times he was struck. The bullet would not have moved the body on impact. She said it is possible that the victim was turning to leave when the second shot was fired. In such a scenario, wound B, which entered the victim's front right torso, would be the result of the first shot fired, and wound A would reflect the second shot. The victim's blood alcohol content was .088 percent, and the lining of the fluid on the inside of his eye was .077 percent. The portion inside the eye is a more accurate reflection of what the brain was experiencing. The portion in the blood is slightly above the mark at which someone can be prosecuted for drinking and driving. She acknowledged that if the victim consistently drank this much, he might have appeared less intoxicated than he was in actuality.

The victim also had diazepam, or Valium, and its breakdown product in his blood stream. The breakdown product in his blood stream indicated that his body had already absorbed part of the Valium and had begun clearing the drug from his system. The quantity of Valium in his system was in a "therapeutic range" and would have made the victim "more mellow" and "less likely to be panicky or nervous." The Valium and alcohol combined might have made the victim less coordinated but would not have rendered him unconscious.

On cross-examination, Dr. Stephens said that it is possible the victim could have gotten the residue on his hand while reaching for Defendant's throat. However, she indicated that if this scenario had taken place there would have been some residue on the victim's body. She said that alcohol would have made the victim more likely to act on impulse and without thought. She agreed

that if the victim was "furious" and "charging" down the hall, he was acting on his feelings and would likely follow through with his intentions unless something stopped him. She said that alcohol affects one's self-control and an individual may be inclined to start a fight in a situation where he or she otherwise would not do so.

## II. Sufficiency of the Evidence

On appeal, Defendant combines his first three assignments of error into one argument that the evidence was insufficient to support a finding that he was guilty of reckless homicide. Defendant contends that the State failed to prove each element of the offense of reckless homicide beyond a reasonable doubt. Specifically, he argues that the State failed to prove Defendant acted "recklessly" in killing the victim. He argues that this element is lacking because the State did not prove Defendant acted with a conscious disregard for the victim's life, or that Defendant's behavior was a gross deviation from the actions an ordinary person would take under the circumstances.

In examining whether the evidence is sufficient to support Defendant's conviction of reckless homicide, we must review the evidence in a light most favorable to the prosecution in determining whether a rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979). Once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Black*, 815 S.W.2d 166, 175 (Tenn. 1991). The defendant has the burden of overcoming this presumption, and the State is entitled to the strongest legitimate view of the evidence along with all reasonable inferences which may be drawn from that evidence. *Id.*; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The jury is presumed to have resolved all conflicts and drawn any reasonable inferences in favor of the State. *State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984). Questions concerning the credibility of witnesses, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). These rules are applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

While there was proof that the victim and Ms. Lyons had an escalated argument, and the victim was yelling and upset, there was no proof that the victim directed any threats toward Defendant, or that Defendant said anything to the victim before shooting him twice. The evidence showed that Defendant and the victim had been friends since childhood. There was no animosity between Defendant and the victim, nor any history of violence. In fact, testimony established that on other occasions the victim had been welcome in Defendant's room. On the night of the killing, the victim was not carrying a weapon when he went to Defendant's room. He did not threaten to kill or harm Defendant in any way. He told Defendant, "Get your punk ass out here. We need to talk." The jury could infer from the proof that Defendant disputed that he owed money to the victim, and that Defendant knew the victim wanted the money on the night of the homicide. Defendant did not verbally respond to the victim or ask him to calm down. When the victim opened the door to

Defendant's room, Defendant calmly shot the victim twice and came out of the room and stated, "I did what I had to do."

Reckless homicide, as relevant here, is "a reckless killing of another." T.C.A. § 39-13-215(a) (2003). "'Reckless' refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." T.C.A. § 39-11-302(c) (2003).

"'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (2003).

Although Defendant argues that the evidence was insufficient to show he acted "recklessly," we conclude that there was sufficient evidence that Defendant acted "knowingly" when he shot the victim two times. When Defendant acted "knowingly," he also acted "recklessly." T.C.A. § 39-11-301(a)(2) ("When recklessness suffices to establish an element [of a crime], that element is also established if a person acts intentionally or knowingly."). Defendant is not entitled to relief on this issue.

## III. Self-Defense

Next, Defendant contends the evidence shows that he had a reasonable belief that he was in imminent danger of death or serious bodily injury so as to justify his shooting in self-defense. He argues that the State did not meet its burden of proving beyond a reasonable doubt that Defendant did not act in self-defense. We note that whether Defendant's conduct was justified is essentially a question of fact for the jury. *See State v. Williams*, 784 S.W.2d 660, 663 (Tenn. Crim. App. 1989). Thus, when reviewing a jury verdict rejecting a claim of self-defense, "in order to prevail, the defendant must show that the evidence relative to justification, such as self-defense, raises, as a matter of law, a reasonable doubt as to his conduct being criminal." *State v. Clifton*, 880 S.W.2d 737, 743 (Tenn. Crim. App. 1994).

With regard to a claim of self-defense, Tennessee Code Annotated section 39-11-611(a)-(b) (2003) provides in part as follows:

> (a) A person is justified in threatening or using force against another person when and to the degree the person reasonably believes the force is immediately necessary to protect against the other's use or attempted use of unlawful force. The person must have a reasonable belief that there is an imminent danger of death or serious bodily

injury. The danger creating the belief of imminent death or serious bodily injury must be real, or honestly believed to be real at the time, and must be founded upon reasonable grounds. There is no duty to retreat before a person threatens or uses force.

(b) Any person using force intended or likely to cause death or serious bodily injury within the person's own residence is presumed to have held a reasonable fear of imminent peril of death or serious bodily injury to self, family or a member of the household when that force is used against another person, not a member of the family or household, who unlawfully and forcibly enters or has unlawfully and forcibly entered the residence, and the person using the force knew or had reason to believe that an unlawful and forcible entry occurred.

Defendant asserts that he weighed eighty pounds less than the victim, that he was diabetic, that the victim was angry and yelling, and that under these circumstances, he feared for his life. He argues that he was trapped by the victim in an eleven by seven-foot room, and that he had nowhere to go to retreat other than to go past his aggressor. Defendant argues that any reasonable person in his position would have felt there was an imminent danger of death or serious bodily injury.

We conclude that the jury properly found that it was unreasonable for Defendant to believe that deadly force was immediately necessary to protect himself against the victim. Although the victim was "furious" and "shaking" Defendant's bedroom door, he did not verbally threaten force or violence, he did not have a weapon, and he did not indicate an intent to harm Defendant. Defendant remained silent while the victim was yelling from the hallway. Then, when the bedroom door opened, Defendant shot the victim two times. Testimony established that one of the shots may have occurred while the victim was retreating and either one of the shots alone could have been fatal. The gun powder residue found on the victim was confined to the victim's right hand. The fact that no other gunpowder was found on his body or around the wounds reveals that he was well over two feet away from Defendant and had barely entered the bedroom. The jury was justified in finding that Defendant's use of deadly force was not warranted under the circumstances. Defendant is not entitled to relief on this issue.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
THOMAS T. WOODALL, JUDGE

-11-